**LUMEX, INC., Plaintiff,**

v.

**Greg HIGHSMITH and Life Fitness, Defendants.**

**CV 96–0855 (ADS).**

United States District Court,
E.D. New York.

March 19, 1996.

Rains & Pogrebin, P.C., Mineola, New York (Frederick D. Braid, Mark N. Reinharz, of counsel), for plaintiff.

Freeborn & Peters, Chicago, Illinois (Steven M. Hartmann, of counsel), for defendants.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This is a lawsuit by a former employer to enforce the terms of a non-competition agreement, sometimes referred to as a restrictive covenant. The two companies involved, the former employer and the prospective new employer, are in the business of manufacturing and selling machines and equipment used in the health fitness industry. Before the Court is a motion for a preliminary injunction by the former employer, seeking to enjoin and restrain the former employee from working with the new employer for a period of six months; to enjoin and restrain the former employee from disclosing any trade secrets and confidential information; and to enjoin and restrain the former employee from soliciting or attempting to solicit its customers.

## BACKGROUND AND INITIAL FINDINGS

Cybex is a division of Lumex, Inc. ("Lumex" or "plaintiff"). Cybex is the manufacturer of weight lifting, strength training and fitness equipment. This type of equipment is used for exercising, body building and for health purposes. There are two general categories of such equipment: (1) the strength training or body building equipment, and (2) cardiovascular equipment such as bicycles and treadmills. There is evidence that Cybex is the largest manufacturer of strength training equipment in the United States. The defendant Life Fitness ("Life Fitness" or the "defendant") also manufactures this kind of equipment. The customers of both companies include gyms, health fitness centers, physical therapy centers, hospitals, Ys, athletic teams, among other institutional and commercial customers.

The defendant Gregory R. Highsmith ("Highsmith") was first employed by Lumex on December 9, 1985 as an Assistant Product Manager, and then was promoted to Product Manager. In 1994, he was named to the position of Cybex Worldwide Marketing Manager. His office was in the plaintiff's Owatonna, Minnesota place of business. While not an officer or director, Highsmith had wide ranging duties within Lumex, was involved in top level meetings and decisions on all matters within the company, and was highly regarded by his employer.

On December 12, 1994, Highsmith signed a "Technical Information and Non–Competition Agreement," ("The Agreement"), for Lumex, which included the following terms:

2. *OBLIGATIONS OF EMPLOYEE.* Employee will be employed by Employer in a capacity such that he has access to or expects to become informed of Confidential or disclose to in (sic) others any Confidential Information without Employer's prior written consent. Upon termination of his employment with Employer, Employee shall promptly deliver to Employer all copies of documents containing Confidential Information in his possession or control and all memoranda, notes, records, reports, photographs, drawings, plans, papers and all other inventions based upon or

derived from confidential Information to which Employee has access while employed with Lumex, within one (1) year after termination of such employment.

    (i) Employee shall properly and fully inform Employer in writing; and

    (ii) Employee shall cooperate fully with Employer and execute and deliver such documents and do such other acts and things as Employer may reasonably request, at Employer's expense to effectuate Employer's right to utilize such inventions.

    (b) *Confidential Information.* Employee shall not at any time, during or after termination of his employment with Employer, directly or indirectly, use documents made or compiled by the Employee or made available to him during the course of his employment, or copies, reproductions or abstracts thereof, whether or not such documents contain Confidential Information.

    (c) *Post–Employment Competition.* For a period of six months after termination of his employment with Employer, Employee shall not, directly or indirectly, render services to, act as an officer, director, partner, consultant or employee of, or otherwise assist any competitor. Employee, however, may accept employment with a competitor the business of which is diversified and which is not a Competitor as to part of such business; provided that Employer shall receive, prior to Employee's rendering services to or assisting such Competitor, written assurances deemed satisfactory by the Employer from the Employee and the Competitor that Employee will not, directly or indirectly, render services to or assist any part of the business which is a Competitor.

There are also the following definitions in the non-competition agreement:

    (c) "Confidential Information" means inventions and also information not generally known or readily obtainable relating to Employer's business, including, but not limited to, such information regarding products, manufacturing procedures, methods, equipment, compositions, technology, formulas, trade secrets, know-how, re-

search and development programs, sales methods, cost of production and overhead, customer lists, customer usages and requirements and other confidential technical or business information and dates.

    (d) "Competitor" means any person, firm, or organization (or parent, subsidiary or affiliate thereof) engaged in or about to become engaged in research on, or the production and/or sale of any Competitive Product, regarding which the employee has obtained Confidential information by virtue of his employment with Employer or with respect to which employee can exert a competitive influence by virtue of the special and unique services he has provided to Employer.

    (e) "Competitive Product" means a product which is similar to or competitive with a product manufactured and/or sold by the Employer, or with respect to which the Employer has conducted research, during the three (3) years immediately preceding termination of the Employee's employment by the Employer.

The agreement further provides that if Highsmith is unable to obtain employment because of the provisions of paragraph 2(c), "such provisions shall be binding upon employee for only so long as the employer (Lumex) shall make payments to Employee equal to his monthly base pay at termination," together with his premiums for health and life insurance. In other words, for such time as Highsmith is unable to find work because of the six-month restrictive covenant, Lumex will pay his salary and other benefits for a period of six months.

On February 9, 1996, Highsmith resigned from his position with Lumex. He has accepted a position with Life Fitness, in which he will work with the defendant's Life Circuit equipment. On February 20, 1996, Augie Nieto, the President and CEO of Life Fitness, sent a letter to counsel for Lumex, stating in part that: "I can assure you that Life Fitness has not and does not intend to induce Mr. Highsmith to breach any contractual obligations he may have had with Cybex, nor do we wish to obtain confidential or trade secret information belonging to your client." (Defendants' Exh. 7).

After being advised of the lawsuit commenced by the plaintiff in the State Supreme Court, Suffolk County, Nieto wrote to J. Raymond Elliott, President and CEO of Lumex, again assuring him "that Life Fitness has not and does not intend to induce Greg to breach any contractual obligations he may have with Cybex, nor do we wish to obtain confidential or trade secret information belonging to Cybex." (Defendants' Exh. 9).

Unconvinced by the written assurances by Life Fitness, and still concerned about the potential disclosure of their trade secrets, confidential information, financial position and prototype future equipment, the plaintiff proceeded forward with this lawsuit.

In the Supreme Court Suffolk County, an *ex parte* temporary restraining order was granted to the plaintiff by the Hon. Elizabeth H. Emerson on February 21, 1996, which provides as follows:

[It is] ORDERED that, pursuant to CPLR § 6313, pending the return date of this motion, Defendant Highsmith is enjoined and restrained from taking any action or actions prohibited by section 2(c) of Technical Information and Non–Competition Agreement between Greg Highsmith and Lumex, Inc. ("the Agreement"); soliciting or attempting to solicit customers of Lumex; and using in any way any confidential information or property of Lumex.

The Court notes that Justice Emerson deleted the provision expressly restraining Highsmith from working for Life Fitness. However, because the Court enjoined Highsmith from "taking any action ... prohibited by Section 2(c)," this could be construed as a prohibition from working for Life Fitness. As of this time, Highsmith has not yet started to work for Life Fitness.

By notice of removal filed with this court on February 27, 1996, this case was removed to this court. The Court held a hearing on the plaintiff's motion for a preliminary injunction on March 5, 1996, March 6, 1996 and March 12, 1996.

### *DISCUSSION*

#### I. *The Standard for the Issuance of a Preliminary Injunction*

■ In the seminal case of *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979), the Second Circuit set forth the applicable standard in this Circuit for obtaining preliminary injunctive relief. According to *Jackson Dairy,* the movant must clearly establish the following:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, supra,* 596 F.2d at 72; *see also Alan Skop, Inc. v. Benjamin Moore, Inc.,* 909 F.2d 59, 60 (2d Cir.1990); *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989). This standard was recently reiterated by the Second Circuit in *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 967 (2d. Cir.1995); *Chemical Bank v. Haseotes,* 13 F.3d 569, 573 (2d Cir.1994) and *ICN Pharmaceuticals, Inc. v. Khan,* 2 F.3d 484, 490 (2d Cir.1993).

Fed.R.Civ.P. 52(a) requires that the district court sufficiently set forth its findings to permit appellate review. *See Society for Good Will to Retarded Children, Inc. v. Cuomo,* 902 F.2d 1085, 1088 (2d. Cir.1990); *Weitzman v. Stein,* 897 F.2d 653 (2d Cir. 1990). The Court will address each of the elements that the plaintiff must establish in order to be entitled to a preliminary injunction; the Court will review the law governing the issuance of a restrictive covenant of this kind; and will make the required findings.

#### II. *Irreparable Harm*

■ A showing of irreparable harm is perhaps considered the single most important requirement with regard to the granting of a preliminary injunction *See Reuters Ltd. v. United Press Int'l, Inc.* 903 F.2d 904, 907 (2d Cir.1990). Essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award. *See e.g., Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal

courts has always been irreparable injury and the inadequacy of legal remedies"). In addition, the applicant must establish more than a mere "possibility" of irreparable harm, rather, it must show that irreparable harm is "likely" to occur. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990).

It is clear that irreparable harm is presumed where a trade secret has been misappropriated. In the words of the Second Circuit, "[a] trade secret once lost is, of course, lost forever" and, as a result, such a loss "cannot be measured in money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984) ("the loss of a trade secret is not measurable in terms of money damages"); *Computer Assocs. Int'l v. Bryan*, 784 F.Supp. 982, 986 (E.D.N.Y.1992) (for purposes of a motion for a preliminary injunction, loss of trade secrets is not measurable in terms of money damages and is thus considered irreparable harm). As explained later in this opinion, the plaintiff has substantiated its claim that Highsmith has learned of trade secrets and confidential information while employed by Lumex and there is the potential of disclosure to the new employer. Accordingly, for the purpose of this determination, the plaintiff has met its burden of demonstrating irreparable harm.

The balance of this opinion will deal with the second element, namely, either (1) the likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunction. In this regard, the Court will discuss the terms of The Agreement; the conduct of the defendants in regard to Highsmith's obligations under the terms of The Agreement; whether the terms of The Agreement are "reasonable" as applied to the circumstances of this case; and the appropriate relief afforded to the plaintiff, if any, under the facts and circumstances of this case.

### III. *The Restrictive Covenant*

This case is in the federal court based on diversity of citizenship jurisdiction. In a diversity case, the law of the forum state applies. *Consorti v. Armstrong World Industries, Inc.*, 72 F.3d 1003, 1011 (2d Cir. 1995); *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir.1994). Here, it is undisputed that the law of New York governs the rights of the parties. In this case, the likelihood of plaintiff's success on the merits is contingent upon the extent of the enforceability of the terms of the restrictive covenant contained in The Agreement.

It is well established that restrictive covenants such as those contained in The Agreement will be enforced only if reasonably limited in scope and duration, and then only to the extent necessary to protect the employer from unfair competition resulting from the use or disclosure of trade secrets or confidential customer lists, or if the former employee's services are unique or extraordinary. *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977); *Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 307–308, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).

As stated very recently by the Second Department, in *Skaggs–Walsh, Inc. v. John Chmiel,* —— A.D.2d ——, 638 N.Y.S.2d 698 (2d Dep't 1996):

It is well established that restrictive covenants contained in employment contracts that tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored in the law (*see Pezrow Corp. v. Seifert*, 197 A.D.2d 856, 602 N.Y.S.2d 468; *Shannon Stables Holding Co. v. Bacon*, 135 A.D.2d 804; *Family Affair Haircutters v. Detling*, 110 A.D.2d 745, 488 N.Y.S.2d 204). Such restrictive covenants will not be enforced "unless necessary to protect the trade secrets, customer lists or good will of the employer's business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services" (*American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 403, 438

N.Y.S.2d 482, 420 N.E.2d 363; *Tulchin Assocs. v. Vignola,* 186 A.D.2d 183, 587 N.Y.S.2d 761; *Altana, Inc. v. Schansinger,* 111 A.D.2d 199, 489 N.Y.S.2d 84).

## IV. *The Crucial Issue*

In this case, there is a special kind of restrictive covenant, one that compensates a former employee who cannot work because of the terms of the agreement. Also, there is a fair and reasonable provision requiring written assurances of compliance by the new employer. Further, the period of time during which the former employee cannot work is of a reasonably short duration, namely, six months.

These facts give rise to the crucial issue in this case. Assume that Highsmith's employment in the Life Fitness Life Circuit product line is not permitted by The Agreement, but there is no proof that Highsmith has as yet disclosed any Cybex confidential or trade secret information, is the plaintiff entitled to a preliminary injunction restraining Highsmith from working for Life Fitness?

## V. *The Hearing—Additional Findings of Fact*

Cybex and Life Fitness are major competitors. There is evidence in the record that Life Fitness is the "number one" Cybex competitor in the marketplace. Both companies sell in the same geographical area. It is conceded that both companies manufacture and sell a piece of fitness equipment known as a "single station variable resistance exercise machine." The Cybex machine works by means of "stacked weights." Life Fitness also manufactures and sells a single station variable resistance exercise machine called "Life Circuit." This machine is computerized and uses electronically controlled motors instead of the conventional stacked weights. The Life Circuit machine is more expensive than Cybex, costing more than twice as much. The Cybex price is approximately $2800, while the list price of Life Circuit is $7,000 but the machine sells for less than that sum, but more than two times the price of Cybex. Both machines are designed to produce tension to particular muscles and thus, strengthen the muscles. Both companies solicit the same customers in the marketplace and often compete for the same limited floor space and budget allotment.

In 1995, Life Fitness entered into an agreement to purchase a company called High Tech, that manufactures a single station variable resistance weight stacked machine, that is concededly similar to and competitive with the Cybex machine. However, this purchase has not yet been consummated, so that, at this time, Life Fitness does not own and is not manufacturing the High Tech weight stacked equipment, although it apparently has a license agreement to sell this equipment.

The Court finds that the companies in the health fitness industry are very aggressive and dynamic. It is also a "copy cat" or cloning industry. Time of the introduction of a product is important because a new or innovative machine has a selling advantage. The goal is to be "first to the market."

The Court finds that Highsmith, as the Lumex Worldwide Marketing Manager and an engineer by training, had a wide range of duties, including marketing and product management. He interacted with virtually every part of the company, including sales, engineering, marketing, manufacturing and research and development. He attended high level policy designing, marketing and financial meetings. Highsmith was not a salesman, or a sales representative, or a sales manager and did not service or solicit Cybex customers. However, he occasionally interacted with some customers to obtain "feedback" and in connection with his other duties. His job was to interpret the market and the market needs and relate it to the Cybex products. Highsmith attended all the trade shows, that are so important in this industry. He interacted and worked closely with Roy Simonson, the Lumex Chief Designer, who the Court finds to be a credible witness, and Highsmith was a sounding board for Simonson with regard to the 25 to 40 Cybex products. During his employment, Highsmith also was privy to information with regard to the Cybex prototypes of new and future equipment, including manufacturing costs and pricing structure, sales training, projected release dates and projected life span.

This was, of course, confidential information not known to persons outside the company, and, certainly, not known to competitors like Life Fitness.

The Court finds that the disclosure to Life Fitness of Cybex confidential data as to the Cybex itself, new and future equipment, pricing, income and Lumex objectives would be greatly detrimental to the business interests of Lumex, and would retard its goal of being "first to the market" with its new products. Highsmith was privy to discussions involving future Cybex markets, products on the drawing board and new prototypes, was a member of the elite strategic planning committee together with the top personnel of Cybex and attended high level meetings in which future restructuring of Cybex was discussed, together with detailed financial information, including costs and Lumex profit margins. During these meetings, a consultant provided the committee members with documents reflecting the activities of the committee. Significantly, new product development was also discussed, as well as a competitive analysis of Cybex and Life Circuit. In fact, at the very end of Highsmith's employment in early February 1996, he became privy to a marketing theme for the important IHRSA trade show, suggested by Fitness Technician and Designer Gary McCoy. The Court finds that all of this information was confidential and constituted trade secrets. In fact, Life Fitness does not dispute this finding. The Court further finds that the disclosure of these trade secrets and confidential information would seriously and irreparably damage the future interests of Lumex.

In December 1995, Robert Hood, a Life Fitness high level employee met with Highsmith in Atlanta, while Highsmith was at a trade show. Highsmith immediately told Hood that he did not want to discuss Cybex matters or its future plans or any other confidential information. During his testimony the Court was impressed with Highsmith's candor. For example, he readily admitted that he was the "hub of the wheel" at Cybex and really coordinated the activities at the company. He defined a trade secret or confidential information as "anything not known outside Cybex." The Court found

that definition not only to be a good lay definition, but very generous to Cybex and contrary to his own interests. In addition, Highsmith readily admitted that, although his job at Life Fitness is not to solicit customers, he would have some customer contact in order to get feedbacks.

Life Fitness renewed its efforts to employ Highsmith. Finally, on January 18, 1996, Highsmith met with Nieto and the top brass of Life Fitness. Highsmith told Nieto that he was a party to a non-compete agreement. Finally, Highsmith accepted a job offer from Life Fitness on January 29, 1996. The offer was to be Director of Product Management for Life Circuit and Life Fitness–Strength (the High Tech product), later changed to only relate to Life Circuit. On February 8, 1996, Highsmith accepted the Life Fitness offer. On Friday, February 9, 1996, he wrote to Eliott resigning his position. Eliott expressed concern about Highsmith's knowledge of the plans of the top level Strategic Planning Committee, and he received Highsmith's repeated assurances that he had no intention of using any of this material, Highsmith left Lumex on February 16, 1996. Highsmith left his office and files intact, downloaded all of his files on his home computer and sent Eliott the disks. Highsmith wrote again to Eliott stating that he would not be in competition with the Cybex strength equipment line and will not reveal Cybex trade secrets.

Significantly, Highsmith testified that although six months is a long time away from work and such a delay "would create a tension between Life Fitness and me," he conceded that "I think that Life Fitness will employ me after the six-month period."

The Court credits the testimony of Gregory Highsmith when he stated that he left all the written Cybex trade secrets and confidential information with Cybex. As of now, he terminated his employment with Lumex as of February 16, 1996 and has not worked at all for Life Fitness, nor has he, as yet, been paid by either company.

The Court finds that the Cybex machine and the Life Circuit machine are both "single station variable resistance machines" and compete for the same markets. As Cybex

sales representative James D. Levine testified, Cybex and Life Circuit "compete every day for every customer who wants to buy single station variable resistance equipment." While none of these type machines is identical, each works on "a" muscle or group of muscles and has the exact same function.

The issue of whether the Cybex and Life Circuit machines were "competitive products" within the purview of Section 1(d) of The Agreement, is a close one. On the one hand, the machines differ substantially as to price and method of operation. Price is a major consideration with most customers, constricted by budget requirements and limited space. The evidence at the hearing revealed that most facilities will have the orthodox weight stacked machine and only some will have an expensive piece of equipment like the Life Circuit machine. In addition, the machines work differently; Cybex by the weight stacked method and Life Circuit by a motor driven computer. So that, as to price and method of operation, there are differences between the two products. On the other hand, and most importantly, both products are single station variable resistance machines and both have the same intended purpose, namely, to strengthen certain muscles, by applying resistance.

Paragraph 1(e) defines a competitive product as one "which is similar to or competitive with a product manufactured and/or sold by the employer." The Court finds that both products have both similar and competitive features, and non-similar and non-competitive features. While this is a close call, the plaintiff's burden on this application for a preliminary injunction is only to establish a "serious question going to the merits," and this is a case where the former employee is privy to many trade secrets and top level confidential information. Accordingly, the Court finds that the Cybex and Life Circuit machines, although dissimilar as to price and one of the processes, do have similar and competitive features, so that the plaintiff has sufficiently established that Life Circuit is similar to or competitive with the Cybex machine, within the provisions of section 1(e) of The Agreement.

The plaintiff's employees testified that "it would be impossible for Highsmith not to divulge confidential information." The Court agrees. The Court finds that, notwithstanding Highsmith's good intentions, there not only is a high risk, but it is inevitable that he will disclose important Cybex trade secrets and confidential information in his efforts to improve the Life Circuit product, and aid his new employer and his own future. Highsmith has even more incentive to further Life Fitness interests, improve Life Circuit and aid in the development of new products, by his bonus and stock option rights in his new employment agreement. As stated above, there is a high risk that in the course of working on Life Circuit or on other Life Fitness business, he will, perhaps inadvertently, disclose Cybex trade secrets, or Lumex pricing and profit structure or even the Cybex future prototypes. Highsmith was privy to the top secret Cybex product, business and financial information. He cannot eradicate these trade secrets and this confidential information from his mind.

In addition, evidence that there will inevitably be immediate disclosure of trade secrets when Highsmith commences his employment with Life Fitness, was adduced in cross-examination of Highsmith. In his candid manner, he readily conceded that it would be possible for him to improve the "feel" of Life Circuit equipment and introduce other changes that would make Life Circuit more competitive in the market, using confidential information gained in his former employment, all to the disadvantage of Cybex.

To his credit, Nieto of Life Fitness wrote to Attorney Braid and to Eliott assuring them that he did not want to receive or discuss any Cybex trade secrets. Nieto also sent a similar memorandum to his top personnel. These measures, although admirable, would not prevent the inevitable disclosure of Cybex trade secrets and confidential information by Highsmith in his attempts to better the Life Circuit product. Even with good faith on the part of Life Fitness, the Cybex trade secrets will have to be revealed, to the plaintiff's serious business detriment.

## VI. *Is the Agreement Reasonable as Applied to the Facts in This Case? What is the Appropriate Remedy?*

The Court finds that the plaintiff Lumex established, by a preponderance of the evidence, that it would be irreparably harmed if the defendant Highsmith revealed to Life Fitness the trade secrets and confidential information he learned in his high level position with Cybex. The Court also finds that the plaintiff established sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in its favor.

■ In this regard, the Court finds that the plaintiff proved that Highsmith learned of trade secrets and confidential information while working for Cybex; that Life Fitness is a "competitor" within the provisions of The Agreement; that the Life Circuit machine is a "competitive product" within the provisions of The Agreement; and that Highsmith's employment with Life Fitness working on the Life Circuit equipment would violate the provisions of paragraph 2(c) of The Agreement, in that he would be working for a "competitor on a competitive product." As stated above, the Court also finds that the disclosure by Highsmith of some Cybex trade secrets and confidential information almost immediately upon entering into the employ of Life Fitness, is inevitable.

Having established the right of the plaintiff to a preliminary injunction, the crucial issues here are the reasonableness of the terms of The Agreement as applied to the facts of this case, and the nature of the appropriate remedy. The plaintiff urges that the Court enjoin the "Defendant Highsmith from working with or for defendant Life Fitness ... for (the agreed upon) period of six months." The defendants contend that because there is no proof of disclosure of any of the trade secrets, preventing Highsmith from working for six months would be unreasonable.

During the hearing the Court asked the parties to brief the issue that now concerns the Court: Namely, assuming that Highsmith's employment in the Life Fitness Life Circuit product line is not permitted by The Agreement, but there is no proof that Highsmith has, as yet, disclosed any Cybex confidential or trade secret information, with the potential disclosure upon employment very real, should the restrictive covenant be enforced so as to prevent Highsmith from working for Life Fitness for the six-month period?

Most of the cases in this field concern factual situations in which trade secrets have already been disclosed, or the former employer's customers have already been solicited. For example, in *Computer Associates Int'l, Inc. v. Bryan*, 784 F.Supp. 982 (E.D.N.Y.1992), a decision of this Court, the defendant misappropriated trade secrets and built and marketed a competing product based on the plaintiff's trade secrets. In *Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100 (E.D.N.Y.1991), the defendant misappropriated documents, divulged trade secrets, solicited plaintiff's customers and his new employer improperly gained four customers.

Of greater relevance, are the cases involving restrictive covenants similar to the one at issue, namely, where the former employee agreed not to work for a competitor, on condition that he would receive his salary during that period from his former employer.

*Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189 (8th Cir.1992) involved a similar restrictive covenant, stating that, if the former employee would not work for a competitor, his former employer would pay his salary. However, in that case, the period during which the former employee could not work was one year. Also, there was evidence of the potential disclosure of trade secrets during the new employment. Nevertheless, the district court refused to prevent the former employee from working for the competitor for one year and only restrained the disclosure of the trade secrets. The following statement is in the circuit court opinion:

> The court found that even if Microscan compensated Morris during his restraint from employment with Vitek, *a protracted absence could alienate Morris's new employer....* Accordingly, the district court undertook the task of crafting an injunction that adequately protects Baxter from harm, while imposing no greater restraint

on Morris than necessary.... We find no abuse of discretion in the district court's order.

Also, in *Baxter,* highly relevant to the Court's determination in this case, the Eighth Circuit stated:

> In the present case, the employment agreement indicates that protection of trade secrets is the goal of the noncompete covenant. *As we noted previously, the district court found that Morris is able to work at Vitek without disclosing Microscan's trade secrets.* The court also found that even if Microscan paid Morris's salary for the year he would be forbidden to work by the covenant, Morris would suffer undue hardship. After balancing the equities, the district court crafted an order it deemed reasonable under the circumstances.... The one-year noncompete covenant contained in Morris's employment agreement with Baxter is overbroad, unreasonably burdensome, and unnecessary for Baxter's protection.... Accordingly, we find the noncompete covenant unenforceable as a matter of Illinois law.

Unlike the facts in *Baxter,* here the period in which Highsmith agreed not to work is six months, not one year. Also, here, unlike the scenario in *Baxter,* the Court finds that Highsmith must inevitably disclose Cybex trade secrets and confidential information.

A New York State case, *Maltby v. Harlow Meyer Savage, Inc.,* 166 Misc.2d 481, 633 N.Y.S.2d 926 (Sup.Ct.N.Y.Co.1995), *aff'd* —— A.D.2d ——, 637 N.Y.S.2d 110 (1st Dep't 1996), also involved a similar restrictive covenant, which provided that the former employee not work for a competitor for six months and be paid during that period. In *Maltby,* the former employee already commenced employment with a direct competitor and the Court found that (1) the plaintiff's trading brokers all have a unique relationship with their customers; (2) the six-month absence of the former employee, also a trader, would not make him unemployable within the industry or substantially impair his ability to earn a living; (3) most importantly, the relationship between the plaintiffs and their customers was unique; and (4) it will take at least six months for a replacement broker to develop the same relationship with the plaintiff's customers. In affirming, the Appellate Division First Department emphasized that the testimony at the hearing established "that the services provided by the plaintiff were unique," *citing Columbia Ribbon* and *Reed, Roberts.* In this case, the Court finds that the services of Highsmith were extremely valuable and essential but were not unique, nor does he have any special relationship with the plaintiff's customers. However, here the facts reveal that Highsmith is a top-level executive who was an important cog in the Cybex organization, and who was privy to the most confidential trade secrets in an extremely competitive industry, where innovative products are the key to success.

In *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), the District Court prevented the former employee both from divulging trade secrets and confidential information and from assuming his position with a competitor. Among other findings, the district court found that there was a clear threat of misappropriation of trade secrets and confidential information. The Court commented on Illinois statutes providing that a court may enjoin the "actual or threatened misappropriation of a trade secret." The district court also emphasized the lack of forthrightness of the former employee both in his activities before accepting his job with the competitor and in his testimony at the hearing, "as factors leading the court to believe that the threat of misappropriation was real." The circuit court affirmed. However, it stated that "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose ... trade secret information' so as to 'demonstrate irreparable injury.'" In *PepsiCo,* the Seventh Circuit emphasized that the district court found a "lack of forthrightness" and "out and out lies" by the former employee, and that he could not be trusted to act with the necessary good faith, and that the district court did not believe the former employee.

The situation in this case is different from the facts in *PepsiCo* in that the Court finds that, up to this time, Highsmith and Life Fitness acted reasonably and in good faith.

In this regard the Court finds that there is no evidence that the defendant Highsmith misappropriated any documents which would be trade secrets; there is no evidence that the defendant Highsmith revealed or divulged to Life Fitness any trade secrets or confidential information; and there is no evidence that Life Fitness accepted, received or now knows or will know any such trade secrets or confidential information. However, as stated above, once Highsmith starts to work for Life Fitness on the Life Circuit equipment, the Court finds that Highsmith will inevitably divulge Cybex trade secrets and confidential information.

In a case involving Minnesota law, *Modern Controls, Inc. v. Andreadakis,* 578 F.2d 1264 (8th Cir.1978), a similar restrictive covenant was at issue, although it restrained the former employee from working for a competitor for two years, a much longer period. A denial of a preliminary injunction by the District Court was reversed, in essence because under Minnesota law "an employer need only show that an employee had access to confidential information and a court will then determine the overall reasonableness of the covenant in the light of the interest sought to be protected." Because the plaintiff established that the former employee did have access to confidential business information, and was not forthright with the former employer, the case was remanded to the District Court to consider whether the covenant was reasonable and what type of injunction was appropriate.

Most of the cases reviewed by the Court either involved restrictive covenants that did not contain an agreement not to work for a competitor with payment of salary by the former employer, or, involved the actual misappropriation and use of trade secrets. Here, Highsmith signed a "technical information and non-competition agreement," in which he agreed and consented that he will not work for a competitor on a competitive product for a period of six months. Further, The Agreement provided that he would be paid his salary and benefits during that six-month period. Under New York law, a restrictive covenant will be enforced only if it is reasonable. The Court's function is to determine, under the facts in this case, whether it is reasonable to prevent this former employee from working for a competitor on a competitive product for a six-month period.

In resolving this issue, two federal district court cases are persuasive. In *Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838 (D.Conn.1976), the former employee, a development engineer in the plastic container industry, signed a restrictive covenant in which he agreed that he would not work in a "competitive enterprise" for a period of eighteen months. Even though there was no proof of actual disclosure, but only the "risk of disclosure," the eighteen-month restrictive covenant was held to be reasonable and was enforced. Then District Judge, now Second Circuit Chief Judge Newman, ruling under New York law, stated that "non-competition covenants are enforceable to the extent necessary to prevent use or 'disclosures' of the former employer's secrets."

With a factual background very similar to the facts in this case, Judge Newman further stated:

It is enough if the second employer's work is sufficiently similar to that of the first employer to make likely the risk of disclosure by the employee in the course of his subsequent employment. "The mere rendition of the service along the lines of [the former employee's] training would almost necessarily impart such knowledge [as he had acquired from the first employer] to some degree." *Eastman Kodak Co. v. Powers Film Products, supra,* [189 A.D. 556] 179 N.Y.S. [325] at 330 [ (1919) ].

In this case both Continental and TPT are endeavoring to develop the identical product, a plastic bottle for carbonated beverages.... Whatever variation there may be in techniques, there is a high risk that in the course of working with the TPT process, Kinsley will, perhaps inadvertently, disclose secret aspects of the Continental process. Some feature of the TPT process may prompt him to compare it favorably with a less satisfactory aspect of the Continental process, or vice versa. It is not difficult to imagine numerous opportunities for such inadvertent disclosure.

Wholly apart from specific secrets concerning its process, Continental is entitled to protection against disclosure to its competitor of the stage of its product development. With a small number of companies competing vigorously to be among the first to develop a new product with potentially enormous sales, information concerning one company's proximity to success would have considerable value to competitors faced with important decisions as to the rate at which their own development should proceed.

Moreover, disclosure of Continental's secrets to TPT poses a risk that TPT itself might make some advantageous use of the information. . . .

All of these circumstances, separately and in combination, indicate the necessity for enforcement of the covenant to protect against disclosure of Continental's secrets.

. . . . .

A preliminary injunction that interferes with a person's gainful employment should never be ordered unless manifestly warranted. . . . The central circumstance is that Kinsley elected to work in one of the most sensitive areas of his former employer's business. . . . To minimize the risk that confidential information would be disclosed, his employer obligated him not to work for a competitor for 18 months after termination. Kinsley elected to quit and promptly went to work for a company that is striving to develop that identical product for a major competitor. . . . Kinsley's continued employment with TPT presents virtually daily opportunities for disclosure of Continental's secrets concerning the development of its plastic bottle by the injection blow-molding process. The risk of irreparable injury is established, as is Continental's likelihood of success on the merits.

Also, in *Business Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068 (S.D.N.Y. 1984), the former employee signed a restrictive covenant in which she agreed not to work for a competitor for a period of "twelve calendar months." As in this case, the former employee did not commence work with the competitor. Similar to this case, the former employee exercised good faith and

did not disclose any trade secrets. In the decision by Judge Sweet, he commented about the good character and good faith of the former employee:

Further, there is no evidence in this record that she is anything other than an extremely competent, able professional, faithful to her commitments as she believed them to exist, nor any reason to conclude that her status as a pawn in the competition between BIS and MTI should affect her employability in a negative fashion.

Nevertheless, Judge Sweet held that the one year covenant not to work for a competitor was reasonable and enforced this agreement with the following language:

The irreparability of the injury to BIS if the injunction is not granted is established by the ephemeral and essential quality of the knowledge which Hudson has the capacity to convey to MTI, were she to violate her covenant not to disclose confidential information. Were she to violate the agreement, it would be difficult in the extreme to establish the existence of the injury as well as the amount of any monetary damage. Given Hudson's knowledge of the BIS software and BIS client relations, BIS will suffer irreparable harm if Hudson discloses such information to a competitor such as MTI. Moreover, such disclosure is likely, if not inevitable and inadvertent, if Hudson commences employment with MTI.

According to Hudson, BIS is not likely to succeed on the merits because the noncompetition clause is unreasonable in duration and geographical scope, is not necessary for the protection of BIS, unreasonably burdens Hudson, and is against public policy. *See Reed Roberts, Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590, 592–93 (1976). The reasonableness of the clause must be measured by the circumstances and the context in which enforcement is sought. *See Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 685, 394 N.Y.S.2d 867, 871, 363 N.E.2d 573, 577 (1977).

The one year restriction on Hudson's employment by a BIS competitor is not an

unreasonable limitation in this case. BIS has expended considerable time, effort and money in developing its software programs. Hudson has knowledge and information with respect to the BIS accounts she has been servicing including difficulties in the BIS software, at least one of which is major, which have been presented in the course of installation and operation. She also is aware of the existing programs and has information concerning the source codes, although, of course, the codes themselves are in document form. . . . She is not directly involved in the development or design of new programs but has information which could be useful to such an undertaking. Within a year her knowledge of these matters will be outdated and of little use. Prior to that time disclosure of Hudson's knowledge to MTI would harm BIS and provide competitive advantage to MTI.

■ The Court finds that, as in *Monovis, Inc. v. Aquino,* 905 F.Supp. 1205, 1234 (W.D.N.Y.1994), "even assuming the best of good faith, it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any . . . work he might engage in" with Life Fitness. Also, as this Court stated in *Computer Assocs. Int'l, Inc. v. Bryan, supra,* at 986, "The potential loss of an industry leader's present market and loss of the advantage of being the pioneer in the field and the market leader, may constitute irreparable harm."

## CONCLUSION

■ The Court finds that the six-month restriction on Highsmith's employment by Life Fitness is reasonable and should be enforced. The restrictive covenant in this case contains fair and reasonable counterbalancing provisions. Under its terms, the former employee can work for a competitor, but not on a "competitive product." Further, the period of six months is a relatively short time. In addition, the former employee will be fully compensated during the six-month period, receiving payment for his salary at the time of termination and "including payment of premiums for health and life insurance." In addition, Highsmith himself con-

ceded that "I think Life Fitness will employ me after the six-month period."

Accordingly the plaintiff, having established irreparable harm and serious questions going to the merits, if not the likelihood of success on the merits, and a balance of hardship tipping decidedly toward the plaintiff, the plaintiff's motion for a preliminary injunction is granted, to the following extent and on the following conditions:

(1) Pending final determination of this litigation, but in no event more than six months from February 19, 1996, the defendant Highsmith is enjoined from working with or for the defendant Life Fitness.

(2) Pending final determination of this lawsuit, the defendant Highsmith is enjoined from disclosing any trade secrets or confidential information of Lumex or Cybex to Life Fitness or anyone else.

(3) Pending final determination of this lawsuit, the defendant Highsmith is enjoined from soliciting or attempting to solicit any customer of Lumex or Cybex.

(4) The plaintiff Lumex is directed to pay to the defendant Highsmith the salary and benefits provided for in The Agreement, from February 19, 1996 for a period of six months and to pay the salary and benefits to the present date within three days from the date of this decision.

(5) The plaintiff Lumex is directed to file a bond in the sum of $100,000, within fourteen days of the date of this decision and order, to assure payment to the defendant Highsmith of his salary and benefits for the six-month period, and to cover damages, if any, in the event the plaintiff does not ultimately prevail in this litigation.

**SO ORDERED.**