**OCEAN SPRAY CRANBERRIES, INC., Plaintiff, Appellant,**

v.

**PEPSICO, INC., Defendant, Appellee.**

**No. 98–1948.**

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1998.

Decided Nov. 12, 1998.

---

James C. Burling with whom Michelle D. Miller, Cynthia D. Vreeland, Mark D. Selwyn and Hale and Dorr LLP were on brief for appellant.

Ronald S. Rolfe with whom Toni G. Wolfman, Michael A. Albert, Foley, Hoag & Eliot LLP, David J. Stone, Illana B. Chill, Victor L. Hou and Cravath, Swaine & Moore were on brief for appellee.

Before BOUDIN, Circuit Judge, REAVLEY,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

BOUDIN, Circuit Judge.

This is an appeal by Ocean Spray Cranberries, Inc. ("Ocean Spray") from a district court order denying Ocean Spray a preliminary injunction against PepsiCo, Inc. ("Pepsi"). The dispute between the two companies centers on their distribution agreement, whose exclusivity clause has apparently been breached by Pepsi. Although the appeal is not without substance, we sustain the district court's refusal to grant the injunctive relief sought.

Ocean Spray is an agricultural cooperative owned by about 950 cranberry and citrus growers. It is a leading producer of canned and bottled juices and juice-flavored beverages; its annual sales appear to be well over $1 billion. Most of its revenue and profits come from so-called "multiserve" juice products (containers with more than 20 ounces), which are sold through brokers and wholesalers.

The issue in this case is Ocean Spray's sale of so-called "single-serve" juice products (containers of 20 ounces or less). Starting in 1992, Pepsi became Ocean Spray's exclusive distributor for single-serve juice products. By 1997, Ocean Spray was deriving about $125 million from the sale of such products through Pepsi's company-owned bottlers. It earned another $100 million or so by sales through independent bottlers licensed by Pepsi to handle Pepsi's own products, but the contracts between Ocean Spray and these independent Pepsi bottlers are not at issue in this case.

Pepsi's company-owned bottlers supply retailers with Pepsi products in territories not served by the independent licensed Pepsi bottlers. When Pepsi became the exclusive distributor for Ocean Spray, its company-owned bottlers ceased to handle the juices of companies competing with Ocean Spray

*. Of the Fifth Circuit, sitting by designation.

(such as Welch's and Mott's). Since 1992, Ocean Spray has enjoyed the use of Pepsi's company-owned bottlers not only to distribute Ocean Spray's single-serve products, but also for a range of related services for those products, including promotion, the securing of national contracts, purchase of shelf space, and installation of coolers in grocery stores and restaurants.

The original 1992 agreement between Pepsi and Ocean Spray was a long-term agreement but did not work smoothly. It was replaced in 1995 by a new, short-term agreement that Pepsi then sought to terminate. Shortly before the termination date, the parties entered into the present agreement in March 1998; the agreement provided for Pepsi to distribute through its company-owned bottlers covered single-serve Ocean Spray juice products. The precise definition of a covered single-serve product is not in dispute.

The 1998 agreement included Pepsi's promise not only to distribute the covered products but also to employ "reasonable best efforts" to promote and sell the Ocean Spray products it distributes. It included exclusivity provisions shortly to be described. And since 1991, when the parties first entered into negotiations, both have been bound by a separate contract to protect each other's confidential information, from marketing and distribution strategy to research and product formulae.

The 1998 agreement is exclusive in both directions. With limited exceptions, Pepsi agreed that it would not distribute any non-carbonated juice or juice-containing beverage that competed with covered Ocean Spray products. One limited exception permitted Pepsi to distribute certain juice products that compete with Ocean Spray covered products if *made* by Pepsi itself and not acquired from a third party by a stock or asset purchase or otherwise. Conversely, Ocean Spray agreed that it would not distribute—other than through Pepsi—its own covered products in the territories of Pepsi bottlers.

The 1998 agreement provided for termination by either party, but the earliest notice Pepsi could give is in 1999, and even then the agreement was to continue until December 31, 2000. Nevertheless, in July 1998, four months after executing the new distribution agreement with Ocean Spray, Pepsi announced that it was purchasing Tropicana Products, Inc. ("Tropicana"), a leading producer of juices and a major competitor of Ocean Spray, especially in the supply of single-serve containers of orange juice.

On August 10, 1998, Ocean Spray filed a complaint and motion for preliminary injunction in the district court. Ocean Spray charged that Pepsi was breaching the 1998 distribution agreement, which barred it from distributing "directly or indirectly" products that competed with Ocean Spray's covered single-serve products. Specifically, Ocean Spray sought to enjoin Tropicana "upon acquisition by Pepsi" from selling competing single-serve juice products for the duration of the Pepsi–Ocean Spray 1998 agreement. Pepsi's acquisition of Tropicana was completed on August 25, 1998.

Pepsi opposed Ocean Spray's motion in the district court, and both sides filed extensive affidavits. On August 20, 1998, the district court entered an order denying Ocean Spray's motion for a preliminary injunction, and on September 4, 1998, the district court entered a memorandum and order reaffirming the denial and setting forth reasons. The primary basis for denying the preliminary injunction was a finding of lack of irreparable injury to Ocean Spray.

On this appeal, Ocean Spray argues that Pepsi has breached its exclusivity obligation under the 1998 agreement, that Pepsi will inevitably (if it has not already) violate the best efforts and confidentiality agreements, and that damages would be difficult, if not impossible, to calculate fully. Pepsi insists that its company-owned bottlers continue faithfully to distribute and market Ocean Spray products and will not handle competing Tropicana products during the remainder of the 1998 agreement's term. Pepsi also denies that it has breached or will breach the confidentiality agreement.

Under federal law, a preliminary injunction depends upon the familiar four-part test requiring the moving party to show likelihood of success on the merits, irreparable

injury, and a favorable balance of the equities, including effects on the public interest. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* F.3d 12, 15 (1st Cir.1996). Massachusetts standards for a preliminary injunction do not seem markedly different, *see Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 405 N.E.2d 106, 112 (Mass.1980), and in any event, neither side here argues that there is a pertinent state-law difference that would govern a federal court in a diversity matter. *Cf. A.W. Chesterton Co., Inc. v. Chesterton,* 907 F.Supp. 19, 25 n. 9 (D.Mass. 1995). The standard of review in this court is deferential.[1]

█ In this case, Pepsi scarcely disputes that the acquisition of Tropicana violated its exclusivity obligation under the agreement as long as Tropicana continues to distribute covered products. Ocean Spray seizes on this (occasionally hedged) concession to argue that the only remaining issue is irreparable injury; it assumes that the equities are favorable to it (Pepsi's breach being deliberate), and that the public interest is served by forcing businesses to adhere to their contracts. The situation is slightly more complicated than Ocean Spray suggests.

█ The likelihood of success that is relevant here where an injunction is sought is the likelihood that Ocean Spray would, after trial, be entitled to a permanent injunction to restrain Tropicana from distributing competing products during the duration of the 1998 agreement. One might suppose that such relief would follow from Pepsi's concession that Pepsi's ownership of Tropicana is itself a breach of the exclusivity clause. Instead, as first-year law students quickly learn, the enforcement of contracts by injunction is the exception rather than the rule.

Historically, equity would not supply relief where legal remedies sufficed, and damages at law usually do provide remedies for breach of contract. *See* Farnsworth, *Contracts* § 12.4, at 852 (2d ed.1990). A famous formulation is Justice Holmes's statement that

"[t]he duty to keep a contract in law means a prediction that you must pay damages if you do not keep it,—and nothing else." Holmes, *The Path of the Law,* 10 Harv. L.Rev. 457, 462 (1897). Modern theorists have explained why it is often "efficient" to limit the remedy to damages and exclude injunctive relief. *E.g., Patton v. Mid–Continent Sys., Inc.,* 841 F.2d 742, 750 (7th Cir.1988) (Posner, J.).

█ Still, injunctive relief requiring performance of a contract may ordinarily be granted (if other prerequisites are met) where monetary damages will not afford complete relief. A common example is agreements involving the sale of real property; specific performance is often granted because property is considered unique. *See, e.g., Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d 273, 278 (7th Cir.1992). The same principle applies where harm caused by a breach, although economic in nature, is impossible to measure accurately. *See Ross–Simons,* 102 F.3d at 19.

Accurate measurement, of course, is a matter of degree. Courts have sometimes refused injunctions to enforce franchise or similar contracts involving ongoing business relationships—situations in which it would ordinarily be difficult to prove with perfect accuracy the revenues lost as a result of the breach. *See, e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *Foreign Motors, Inc. v. Audi of America, Inc.,* 755 F.Supp. 30, 33 (D.Mass. 1991). Thus, some measure of uncertainty does not automatically avoid Holmes's precept.

Yet in other cases, uncertainty has been deemed to warrant injunctions. For example, in *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907 (1st Cir.1989), this court upheld a preliminary injunction for K–Mart where a shopping mall-landlord threatened to construct new retail space in a parking lot in front of the K–Mart, apparently contrary to the terms of the parties' 20–year lease agreement. We agreed that "the loss of revenues

---

1. The usual rubric refers to abuse of discretion, *see Ross–Simons,* 102 F.3d at 16, but this phrasing is most pertinent to issues of judgment and the balancing of conflicting factors; rulings on abstract legal issues remain reviewable *de novo,* and findings of fact are assessed for clear error, *see American Bd. of Psychiatry and Neurology, Inc. v. Johnson–Powell,* 129 F.3d 1, 2–3 (1st Cir.1997).

resulting from considerations such as diminished visibility, restricted access, less commodious parking, and the like are sufficiently problematic as to defy precise dollar quantification." *Id.* at 915.[2]

In this case, Pepsi's acquisition of Tropicana alters its incentives to promote Ocean Spray if—and this is a large "if"—one disregards possible sanctions against Pepsi. Without Tropicana, Pepsi's incentives in pricing and promotion of Ocean Spray's covered products are largely aligned with those of Ocean Spray, assuming that the distribution contract was competently drafted. As one of Ocean Spray's experts points out in his affidavit, Tropicana's acquisition inserts a conflicting incentive, namely, that successful promotion of Ocean Spray can take sales away from Tropicana, in which Pepsi now has an economic interest.

Of course, the change in incentive is limited. The customer sales representatives who work for Pepsi's company-owned bottlers apparently receive compensation based on a percentage of sales. Pepsi also has an incentive to keep content the retailers to whom it supplies Pepsi, as well as Ocean Spray, products. Still, especially at higher levels of the Pepsi company, strategy as to distribution, Pepsi's pricing of Ocean Spray products its promotion expenditures, and other decisions could be affected by the prospect that Pepsi's long-term interests are now aligned with Tropicana.

Ocean Spray's affidavit also makes a plausible case that, to the extent that Pepsi does slacken its efforts to promote Ocean Spray's covered products during the remaining (probably brief) life of the 1998 agreement,

the impact could go beyond the loss of sales and profits. One affiant points to so-called "spillover" effects by which diminished promotion of Ocean Spray's widely available single-serve products could in turn diminish sales of its larger container products; and consequences may endure beyond the termination of the agreement, whether viewed as longer-term loss of sales or impairment of the value of Ocean Spray's trademark. Damages may be difficult to prove with complete accuracy.

Nevertheless, there is another side to the story. Pepsi and Ocean Spray have a relationship stretching back to 1992; although the contracts differed during this period, this history provides some benchmark for making judgments as to Pepsi's future efforts. Prior sales levels and other prior conduct of Pepsi vis à vis Ocean Spray's products, may make it much easier for Ocean Spray to detect Pepsi's failure to use its best efforts hereafter to promote Ocean Spray's products. Certainly difficulties in detecting immediate lost sales and profits appear to be considerably less than in calculating the amount of spillover or long-term effects.

If we assume that any slackening of effort can be detected, Pepsi has counter-incentives to continue behaving as it would if Tropicana had never been acquired. While contract violations do not normally give rise to punitive damages, a deliberate breach of Pepsi's best efforts obligations could give rise to *multiple* damages under Massachusetts's chapter 93A, a claim that Ocean Spray has already asserted in its complaint.[3] And there is nothing that would prevent Ocean Spray from renewing its request for injunc-

---

**2.** Similarly, in *Ross–Simons*, 102 F.3d at 20, this court upheld a preliminary injunction against Baccarat, which, in apparent violation of the parties' contractual agreement, refused to continue selling its famous crystal to Ross–Simons, a discount retailer. We noted that apart from direct loss of sales of the crystal, Baccarat's withdrawal would undermine Ross–Simons' wedding registry service, alienating the retailer's potential registrants and diminishing its reputation—goodwill and reputation in particular being "not easily measured or fully compensable in damages." *Id.*

**3.** Massachusetts forbids by statute "[u]nfair methods of competition and unfair or deceptive

acts or practices" in the course of commerce. Mass. Gen. Laws ch. 93A, § 2 (1997). The statute allows for double or treble damages for its willful or knowing violation. *See id.* § 11. Under this statutory scheme, courts have made clear that breach of contract " 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party" may give rise to 93A liability. *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir.1996), *quoting Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 821 (Mass.1991). If the breach is particularly egregious, it can prompt punitive damages. *See, e.g., Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir.1996).

tive relief if it could detect and establish that Pepsi was not using its best efforts on behalf of Ocean Spray.

In this important respect, Ocean Spray's situation is very different from that of the plaintiffs in *K–Mart* and *Ross–Simons*. There, the defendants' proposed actions would have had immediate adverse effect on the plaintiffs (construction of an obstructing building in one case and the cut-off of supplies in the other). Here, Pepsi's company-owned bottler distribution channel remains open to Ocean Spray, and the only question is whether Pepsi will let its pricing and promotion behavior be influenced by the Tropicana acquisition. Although businesses act in their economic best interests, those interests in this case include avoiding multiple damages and the risk of devastating injunctive relief.

The second consideration is duration. Pepsi can give notice of termination as early as January 1, 1999 (although it would then continue distributing Ocean Spray until the end of the year 2000). Ocean Spray had to know that during that contractually established transition period Pepsi might consider aligning its fortunes with another supplier. In fact, the 1998 agreement provided for arbitration if there were a claim by Ocean Spray of lost sales during this transition.

This is in stark contrast to a case like *K–Mart* in which the obligation being breached was a 20–year commitment. *See KMart*, 875 F.2d at 915–16. Not only is the harm potentially much greater as the period stretches out, but so also the difficulties of calculating damages. *See id.* We do not say that there is some basic dividing line between one year and 20, but only that this is a further consideration that limits the significance of any claim of irreparable damages.

■ Finally, if Pepsi did wrongfully reduce its efforts on behalf of Ocean Spray and that fact were proved, the jury would then be entitled to very considerable latitude in estimating the damages, both from direct and indirect effects. It is well settled that the jury is given a good deal of freedom in estimating damages against a defendant who created the risk of uncertainty as to damages by its own wrongdoing. *See Jay Edwards,*

*Inc. v. New England Toyota Distrib., Inc.,* 708 F.2d 814, 821 (1st Cir.1983), *cert. denied,* 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983); *Computer Sys. Eng., Inc. v. Qantel Corp.,* 740 F.2d 59, 67 (1st Cir.1984) (Massachusetts law). And, if any up-side error is likely to be doubled or tripled under chapter 93A, the risks for Pepsi are multiplied.

One other consideration affecting equities although not damages is the drastic relief sought by Ocean Spray. Effectively, Ocean Spray is asking that after the acquisition, Tropicana be forbidden from continuing to use its own channels to distribute its own single-serve juices *at all* in geographic areas in which Ocean Spray distributes its competing products. Tropicana is a leading competitor, and the effect of so drastic a solution would be greatly to benefit Ocean Spray by undercutting competition from Tropicana that existed long before the acquisition was a twinkle in Pepsi's eye.

■ We turn now to a different claim by Ocean Spray: that Pepsi has breached and will continue to breach its obligation under the 1991 agreement to keep confidential Ocean Spray's business information. Ocean Spray complains that at the top level of Pepsi management, the same individuals are responsible not only for Ocean Spray but for Tropicana. Ocean Spray points to cases in which the courts have granted injunctions merely to prevent conduct creating a risk that confidential information will be divulged or misused. *See, e.g., Crane Co. v. Briggs Manufacturing Co.,* 280 F.2d 747, 750 (6th Cir.1960); *Lumex, Inc. v. Highsmith,* 919 F.Supp. 624, 636 (E.D.N.Y.1996).

Ocean Spray does not spend much time on this issue in its brief, addressing it in only a few paragraphs. The case law suggests that almost everything turns upon the facts, including the nature of the transaction, the threat of wrongful disclosure, the consequences if it occurs, and the reach of the relief sought. Nothing that we can discern in reviewing the affidavits persuades us that there is anything inevitable about the misuse by Pepsi of whatever information Ocean Spray has given or chooses to give in the future.

Furthermore, Ocean Spray's claim as to disclosure is offered only to support the far-reaching injunction it seeks restraining Tropicana from distributing competing products for the life of the agreement. Nothing prevents Ocean Spray from seeking narrower relief, if this should prove warranted, enjoining the misuse of confidential information, limiting its distribution within Pepsi, or otherwise tailoring relief to meet the claimed threat of harm. Whether blatant misuse might justify even broader relief against Tropicana's distribution activity is an issue that need not now be faced.

*Affirmed.*